UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SERVICE STEEL WAREHOUSE COMPANY, L.P.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-1416** |
| **THE MCDONNEL GROUP, LLC, ARCHER WESTERN CONTRACTORS, LLC, TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, AND LIBERTY MUTUAL INSURANCE COMPANY** | **SECTION "L" (2)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    PROCEDURAL HISTORY

Pursuant to a contract, Plaintiff, Service Steel, provided steel for the construction of an Intake Processing Center for the Law Enforcement District of Orleans Parish ("Project"). Specifically, Service Steel agreed to provide steel to H&H Steel Fabricators, Inc. (H&H), who fabricated the steel and supplied it to the general contractor, a Joint Venture between The McDonnel Group, LLC and Archer Western Contractors, LLC, ("McDonnel-Archer" or "the Joint Venture" or "the General Contractor"). Travelers Casualty and Surety Company of America ("Travelers") and Liberty Mutual Insurance Company ("Liberty Mutual" and, together, "Insurers") jointly issued the statutorily-required Labor and Material Payment Bond ("Bond") on the Project. McDonnel-Archer secured and executed the Bond, and Travelers and Liberty Mutual are sureties on the Bond

H&H was unable to pay Service Steel up front for the steel, but had to wait until H&H was paid for its fabrication work. Because Service Steel was worried they would not get paid for their steel, H&H worked out a deal with the Joint Venture and the Project owner whereby the Project owner would pay for the steel stored in H&H's facility awaiting fabrication ("Stored

1

Material"). The Project owner later reversed its decision, and Service Steel threatened to pick up the steel from H&H.

To reassure Service Steel that they would be paid and to avoid the loss of steel for the Project, Defendants issued a rider to the Bond that provided Service Steel with a contractual claim against the Bond. The Joint Venture, H&H, and Service Steel also entered into a Joint Check Agreement whereby all payments the Joint Venture made to H&H for the steel delivered by Service Steel would be jointly issued to both H&H and Service Steel. Finally, the Joint Venture also agreed to pay Service Steel 50% up front for the stored material when it was delivered to H&H, including for material already delivered for which Service Steel had not been paid, and the remaining 50% when H&H's fabricated material was delivered to the Project (the "Payment Promise").

Ultimately, Service Steel sold and delivered to H&H $2,116,366.65 worth of steel for the Project, but was only paid $1,318,115.97, leaving $798,250.68 unpaid. H&H is now out of business. Service Steel filed this case against the contractors, McDonnel Group and Archer Western, and the Bond holders or sureties, Travelers and Liberty Mutual, seeking the remaining $798,250.68 along with legal interest on the amount awarded, if any.

Portions of this case were settled before trial for $479,560.20. The remainder of the case come on for a non-jury trial on July 6, 2016, and concluded later that day. At the trial, Service Steel sought the remaining $318,690.48, arguing that they detrimentally relied on the Payment Promise. Service Steel also sought legal interest on both the settlement amount and the amount to be awarded at trial, if any. The Defendants stipulated during the settlement that, if the court should award legal interest, the $479,560.20 settled before trial would be considered part of the amount awarded at trial for interest calculation purposes.

The Court has carefully considered the testimony of the witnesses, the exhibits entered into evidence, and the entire record, and hereby enters the following findings of fact and conclusions of law.  To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such. And to the extent that a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## II.     FINDINGS OF FACT

(1)

Plaintiff, Service Steel, is a Texas limited partnership and steel and construction materials supplier, who supplies material to steel fabricators and construction contractors throughout the United States.

(2)

The Project at issue in this litigation involves the construction of a new prison facility, the New Orleans Prison Intake Processing Center/Templeman III & IV Replacement.

(3)

Defendant McDonnel-Archer, a Joint Venture, is the general contractor on the Project.

(4)

Effective July 28, 2011, Travelers and Liberty Mutual jointly issued the statutorily-required Labor and Material Payment Bond on the Project. McDonnel-Archer secured and executed the Bond. Travelers and Liberty Mutual are sureties on the Bond.

(5)

H&H was the fabricated steel supplier to McDonnel-Archer on the Project. H&H was selected as the fabricated steel supplier even though McDonnel-Archer knew that H&H was financially risky. H&H's bid was significantly lower than all other bidders.

(6)

H&H purchased steel decking, raw structural steel, and raw miscellaneous steel for its fabrication work. Service Steel and Delta Steel, Inc. ("Delta") were the only suppliers of raw structural and miscellaneous steel to H&H for the Project. H&H was required to use domestic steel for structural components but could use foreign miscellaneous steel for some ancillary aspects of the job.

(7)

In 2007, prior to the commencement of the Project, H&H entered into a credit agreement with Service Steel. When H&H ordered steel from Service Steel, it informed Service Steel for which project the steel was being ordered. When steel was delivered to H&H, Service Steel provided H&H with a copy of the Sales Order.

(8)

H&H used steel that Service Steel and Delta provided to fabricate structural steel components for the project and provided the fabricated steel to McDonnel-Archer and/or delivered the fabricated structural steel to the Project site for erection and incorporation.

(9)

The Project owner initially agreed to pay for raw material stored at H&H's yard ("Stored Material") that was sold to H&H by Service Steel and Delta. McDonnel-Archer and H&H executed an agreement that transferred ownership of Stored Material to the Project owner upon payment for that Stored Material. In April 2012, the Project owner authorized payment for $411,954.39 worth of Stored Material sold by Service Steel, and in April 2012, McDonnel-Archer paid H&H/Service Steel $411,954.39 for certain material, which Service Steel had sold and delivered to H&H in 2011 and 2012. In order to receive its April payment for Stored

Material, Service Steel had to execute releases and provide proof only that H&H ordered the steel for the Project and that the steel was delivered to H&H.

(10)

After authorizing the $411,954.39 payment for Stored Material sold by Service Steel, the Project owner changed its position and refused to authorize payment for any more Stored Material. The Project owner's decision to refuse to authorize payment for Stored Material was not related to the actions of Service Steel.

(11)

When the Project owner refused to authorize payment for Stored Material, McDonnel-Archer refused to pay for the Stored Material. H&H then was unable to pay for Stored Material.

(12)

When Service Steel was told it was not going to receive payment for the Stored Material it had delivered to H&H, Service Steel threatened to pick up the Stored Material and not sell further steel for the Project. Service Steel had the right to pick up the Stored Material because it had a security interest in that material. If Service Steel picked up the Stored Material it would be very problematic for McDonnel-Archer and the Project, because of delays and increased costs.

(13)

To avoid the problems that would arise if Service Steel picked up the Stored Material and/or stopped selling steel to H&H for the Project, McDonnel-Archer offered Service Steel a claim against the Labor and Material Bond to ensure payment. On July 26, 2012, McDonnel-Archer, Travelers, and Liberty Mutual executed a Rider to the Bond. The Rider provides that Service Steel will be a claimant as that term is defined in Paragraph 1 of the Bond. Service Steel accepted the right to collect on the Bond as security for Stored Materials.

(14)

In connection with providing Service Steel a claim against the Bond, McDonnel-Archer also executed a Joint Check Agreement with Service Steel and H&H. Under the Joint Check Agreement, McDonnel-Archer agreed to issue joint checks to H&H and Service Steel when McDonnel-Archer paid H&H for the materials Service Steel supplied to the Project.

(15)

Neither the Bond nor the Joint Check Agreement, however, fully addressed the payment problem. Service Steel still required that it be paid for Stored Material, or Service Steel would both pick up and stop selling its steel to H&H for the Project.

(16)

McDonnel-Archer attempted but was unable to convince the Project owner to resume paying for Stored Material. Accordingly, to persuade Service Steel to leave its steel at H&H and to continue selling steel to H&H, on September 24, 2012, McDonnel-Archer, through email, promised to pay Service Steel for Stored Material previously delivered to H&H through July 2012: 50% of the price of the steel sold to H&H would be paid immediately, and the remaining 50% would be paid when H&H delivered its fabricated material to the Project.

(17)

McDonnel-Archer then agreed that the promise to pay for Stored Material would apply to all future material Service Steel sold to H&H for the Project.

(18)

In order to be paid for Stored Material under the Payment Promise, Service Steel had to provide the requested waivers. Service Steel also had to prove that H&H ordered the steel for the Project and that the steel was delivered to H&H. At the time McDonnel-Archer made the

Payment Promise, it did not require that Service Steel prove its steel was incorporated into the Project in order to be paid. At the time McDonnel-Archer made the Payment Promise, it did not require that Service Steel prove its steel was used or reasonably required for use in performing its contract with the Project owner in order for Service Steel to be paid.

(19)

Based on the Bond Rider, Joint Check Agreement, and Payment Promise, Service Steel did not pick up its Stored Material and agreed to continue selling H&H the steel it ordered for the Project. Service Steel continued to sell steel to H&H for the Project through August 2013. McDonnel-Archer never told Service Steel to stop selling or shipping material, even towards the end of the Project when McDonnel-Archer realized that H&H had ordered more steel than originally anticipated.

(20)

As is common practice in the industry, Service Steel does not break up individual invoices when being paid. Accordingly, when Service Steel received its first 50% payment after the Payment Promise, rather than consider it payment for 50% of the specific invoices, Service Steel applied the payment to the oldest outstanding invoices. Service Steel informed McDonnel-Archer that it would apply payments to the oldest outstanding invoices, and this was acceptable to McDonnel-Archer.

(21)

In March 2013, McDonnel-Archer paid H&H/Service Steel $25,111.77 for material which Service Steel sold and delivered to H&H in 2012.

(22)

In August 2013, McDonnel-Archer paid H&H/Service Steel $461,940.28, which compensated Service Steel for the remaining invoices for steel sold and delivered to H&H in 2012.

(23)

In order to receive its March and August payments for Stored Material, Service Steel had to execute releases and provide proof only that H&H ordered the steel for the Project and that the steel was delivered to H&H. Service Steel did not have to prove its steel was incorporated into the Project or used or reasonably required for use in performing McDonnel-Archer's contract with the Project owner.

(24)

H&H delivered the last of its fabricated members in September 2013 and McDonnel-Archer and the Project owner has had use of that steel ever since. McDonnel-Archer did not issue any further payment to Service Steel after the fabricated materials were delivered in September 2013.

### III.  CONCLUSIONS OF LAW

(1)

Federal Courts are courts of limited jurisdiction. "A party may neither consent to nor waive federal subject matter jurisdiction." *Simon v. Wal-Mart Stores, Inc.*, 193 F.3d 848, 850 (5th Cir. 1999). Service Steel's action is brought pursuant to the theory of detrimental reliance, codified in Louisiana Civil Code Article 1967. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), which provides original jurisdiction over citizens of different

states when the amount in controversy exceeds $75,000, exclusive of interests and costs. In this case, neither the domicile of the parties nor the amount in controversy is in dispute.

(2)

This Project at issue is in the state of Louisiana, and the contract was a Louisiana contract. A federal court sitting in diversity must apply the substantive law of the state in which it sits. *See Erie v. Tompkins*, 304 U.S. 64, 71–77 (1938). The state of Louisiana would apply Louisiana law to interpret the contract at issue and the claim of detrimental reliance. Thus, the law of the state of Louisiana is the substantive law applicable to this case.

### A. Detrimental Reliance

(3)

The theory of detrimental reliance is codified in Louisiana Civil Code Article 1967. La. Civ. Code art. 1967. "The doctrine of detrimental reliance is "designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence." Suire v. Lafayette City-Parish Consol. Gov., 907 So. 2d 37 (La. 2005) (citations omitted). Detrimental reliance claims are not favored and are examined carefully and strictly under Louisiana law. *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319 (5th Cir. 2007). "To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Id*. "[T]o prevail on a detrimental reliance claim, Louisiana law does not require proof of a formal, valid, and enforceable contract." *Id*. Service Steel asserts that it detrimentally relied on the Bond, Joint Check Agreement and, particularly, the Payment Promise, and, in accordance with reliance, Service Steel delivered the steel H&H ordered for the Project and expected to be paid for the delivered steel.

(4)

"[T]he basis of detrimental reliance is the idea that a person should not harm another person by making promises that he will not keep. Id. (quotations and citations removed). "Thus, the focus of analysis of a detrimental reliance claim is not whether the parties intended to perform, but, instead, whether a representation was made in such a manner that the promisor should have expected the promisee to rely upon it, and whether the promisee so relies to his detriment." Id.

(5)

The Bond Rider gave Service Steel security for the steel Service Steel sold to H&H for the Project. While the Rider gave Service Steel this security, the Bond Rider alone was not enough to convince Service Steel not to pick up its Stored Materials and to continue selling to H&H for the project. The Rider alone is not the only representation upon which Service Steel relied when it decided to continue business with H&H and, therefore, with McDonnel-Archer. The Rider is, therefore, not the representation upon which the claim of detrimental reliance rests.

(6)

Like the Rider, the Joint Check Agreement provided Service Steel security for the material it sold to H&H for the Project. While the Joint Check Agreement did not solve the issue of non-payment, it reassure Service Steel that the payments McDonnel-Archer made to H&H for the steel Service Steel sold to H&H would be paid to Service Steel and not remain with H&H. Like the Bond Rider, this agreement, however, was not enough to convince Service Steel to not pick up the Stored Materials and to continue selling to H&H for the Project. The Joint Check

10

Agreement is, therefore, also not the sole representation upon which the claim of detrimental reliance rests.

### i. The Representation

(7)

In addition to the Bond Rider and the Joint Check Agreement, a Payment Promise was made by McDonnel-Archer. In an email from David Swies dated September 24, 2012, McDonnel-Archer told Service Steel that McDonnel-Archer would pay Service Steel 50% for the steel Service Steel sold to H&H when it arrived at H&H, and the remaining 50% when H&H delivered its fabricated material to the Project. The email representation did not require Service Steel to prove that the fabricated material used their steel, it merely stated that Service Steel would be paid the remaining 50% upon delivery of the fabricated materials. Nothing in the email suggested that Service Steel would ever be paid less than 100% for the material they delivered, provided Service Steel delivered the steel H&H ordered for the project and provided that H&H delivered the fabricated material to McDonnel-Archer. McDonnel-Archer made a representation to Service Steel that it would pay for 100% of the steel Service Steel delivered to H&H for the Project. Service Steel relied on that Payment Promise when it decided to leave its previously-delivered steel with H&H and continue selling additional steel for the Project. Thus the first element of detrimental reliance is satisfied.

### ii. The Justifiable Reliance

(8)

Satisfying the second element of a detrimental reliance claim, Service Steel justifiably relied on the Payment Promise, and therefore delivered steel to H&H that H&H ordered for the Project. The Payment Promise specifically referenced payment for Stored Materials and the


failure of the Project owner to pay for Stored Materials, indicating that McDonnel-Archer intended to pay for the same Stored Materials for which the Project owner had initially agreed to pay. Service Steel justifiably relied on the Payment Promise when, after providing proof that H&H ordered the steel and that Service Steel delivered the steel, it expected to be paid the remaining 50%. These were the only requirements necessary for the payments made by McDonnel-Archer in April 2012, October 2012, March 2013, and August 2013. It was not until after Service Steel had delivered all of the requested steel to H&H and McDonnel-Archer had received all of the fabricated steel from H&H that McDonnel-Archer for the first time informed Service Steel that it had to prove incorporation of its steel in order to be paid. There was never any representation that McDonnel-Archer would pay Service Steel less than 100% of what it was owed for the steel Service Steel delivered to H&H for the Project.

(9)

Defendants assert that Service Steel's reliance was unreasonable because Service Steel should have known that there was more steel being ordered by and delivered to H&H than was required for the Project. Tracking the amount of steel required for the Project, however, was not Service Steel's responsibility. Service Steel did, however, confirm with H&H when H&H ordered material for the Project that Service Steel did not expect. H&H reassured Service Steel that the orders were correct. H&H was responsible for placing the steel orders for the Project, and it was not unreasonable for Service Steel to rely on H&H to place the correct orders. Service Steel was also never told by H&H, McDonnel-Archer, or any other party the total amount of steel necessary for the Project or how much would be provided by other steel suppliers. Accordingly, Service Steel could not know whether H&H was over-ordering steel as it did not know the total amount of steel required or the amount of steel Delta provided. McDonnel-Archer

was in the best position to know the steel expected for the Project and the steel delivered to H&H, as McDonnel-Archer had full access to H&H's information; Service Steel periodically sent information to McDonnel-Archer regarding the amount of steel being ordered; and McDonnel-Archer had a representative onsite at H&H to help monitor fabrication. This representative never reported any excess orders and McDonnel-Archer never told Service Steel to stop delivering steel to the Project.

### iii. The Change in Position

(10)

Finally, satisfying the third element of a claim of detrimental reliance, Service Steel changed its position to its detriment because of its reliance on McDonnel-Archer's representation. Instead of picking up the Stored Material and refusing to sell additional steel to H&H for the Project, Service Steel left the Stored Material with H&H and continued to sell them steel it ordered for the Project. "[T]o establish reliance to his detriment, [plaintiff] need only show that he suffered damages not adequately compensated by the defendant. Suire, 907 So. 2d at 59 (citing Babkow v. Morris Bart, P.L.C., 726 So. 2d 423, 428 (La. App. 4 Cir. 1998) (finding adequate proof of reliance where it was undisputed that the defendant owed a balance of $2,256 on the plaintiff's chiropractic bills). Even after the Bond rider and Joint Check Agreement were issued, Service Steel informed both H&H and McDonnel-Archer that, if it was not paid, it would pick up the steel and stop selling steel for the Project. After receiving the Payment Promise, however, Service Steel allowed its steel to remain with H&H and continued selling steel for the Project. Service Steel sold and delivered to H&H a total of $2,160,243.04 worth of steel to H&H for the Project. Service Steel accepted returns totaling $43,876.39. Service Steel has been paid a total of $1,318,115.97 for steel sold and delivered to H&H for the Project. Service Steel had a

principal balance owed of $798,250.68 for material sold and delivered to H&H for the Project. Because of the Payment Promise, Service Steel is entitled to the entire balance owed of $798,250.68. Because $479,560.20 of the $798,250.68 was settled before trial, Service Steel is now entitled to the remaining $318,690.48.

### B. Interest

(11)

Because the Plaintiff in this case recovers under state law, the attachment of prejudgment interest is also determined by state law. *See, e.g.*, *Wright v. Hollywood Marine, Inc.*, 789 So. 2d 49, 63 (La. Ct. App. 2001). Postjudgment interest, on the other hand, is determined by federal law, specifically 28 U.S.C. § 1961. *See, e.g.*, *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 622 (5th Cir. 1988); *Levy v. Am. Sec. Ins. Co.*, CIVIL ACTION NO. 91-4297 SECTION: E/6, 1994 U.S. Dist. LEXIS 1946, at *7-8 (E.D. La. Feb. 17, 1994).

The theory of detrimental reliance finds its source in contract law. Therefore, the rules and regulations applicable to contract law extend to detrimental reliance.

In general, interest for damages for breach of contract to pay money runs from date the contract amounts are due, and where breach is for non-monetary obligations, from the date of judicial demand. *See, e.g.*, *Alexander v. Burroughs Corp.*, 359 So. 2d 607, 613 (La. 1978); *Trans-Glob. Alloy, Ltd. v. First Nat'l Bank*, 583 So. 2d 443, 457-59 (La. 1991) (granting judicial interest from the date of judicial demand, but acknowledging that interest from the date of breach would be appropriate in less complex cases with readily-ascertainable damage amounts); *Morris & Dickson Co. v. Jones Bros. Co.*, 691 So. 2d 882, 893 ( La. App. 1997) ("In general, interest for damages for breach of contract to pay money runs from the date the contract amount is due, and where the breach is for a nonmonetary obligation, from the date of judicial demand."); *Nat'l Tea*

*Co. v. Plymouth Rubber Co.*, 663 So. 2d 801, 808 (La. App. 1995) ("[I]n a breach of contract case, judicial interest is due on the date that the contract has been breached."); *Nat'l Roofing & Siding Co. v. Gros*, 433 So. 2d 403, 405-06 (La. Ct. App. 1983).

According to the Louisiana Civil Code, "[w]hen the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by Article 2924." La. Civ. Code Ann. § art.2000; *see also Hollenshead v. Gemini Explorations Inc.,* 44 So. 3d 809 (La. App. 2010). In the instant case, the parties did not agree to a rate and will therefore employ the rate fixed by La. Civ. Code Art. 2924, which is 4% annually.

The parties have stipulated that prejudgment interest would be computed on the total amount due, $798,250.68, notwithstanding the fact that prior to trial, the defendants paid $479,560.20, leaving a balance of $318,690.48 to be disputed at trial. Because this Court awarded Service Steel the remaining $318,690.48, Service Steel is entitled to judicial interest on the total, $798,250.68, from October 1, 2013, until the date of this judgment at a rate of 4% pursuant to La. Civ. Code 2924 and La. R.S. 13:4202(B), which is $90,315.92. Accordingly, this Court awards Service Steel the sum of the amount still due on the contract, $318,690.48 and the prejudgment interest, $90,315.92, totaling $409,006.40, plus post-judgment interest pursuant to 28 U.S.C. § 1961 until paid.

**IV. SUMMARY**

On the basis of the above Findings of Facts and Conclusions of Law, the Court finds that Defendant Service Steel is entitled to $409,006.40, plus post-judgment interest at the federal rate until paid, because Service Steel detrimentally relied on the representations of McDonnel-Archer.

New Orleans, Louisiana this 29th day of July 2016.

_____
UNITED STATES DISTRICT JUDGE